This case is 4-110-357 Stark Excavating v. Carter Construction for the Appellant Stanley Wasser and for the Appellant Kevin Colombo.  Good morning, Your Honors Counsel. Stanley Wasser for the Plaintiff Appellant Stark Excavating. Just the bottom line. In a nutshell, Stark, to remind the Court, Stark was a subcontractor. Carter Construction was a general contractor. There's a dispute over a payment for extra work. The trial court gives a summary judgment on Count 1 on this winter protection. Issue all other issues having been stipulated to be dismissed. The trial court granted the 2619 motions to dismiss Counts 2 and 3, the quantum error and the unjust enrichment counts. It was a little bit of a... I couldn't figure out whether this is a 2615 case or a 2619 case or a summary judgment case. I believe what happened, Judge, Your Honor, is that in Count 1, it was addressed through summary judgment. On the winter protection, the motion of Carter granted summary judgment. And then when the complaint was amended and Counts 2 and 3 were added on the first amended complaint, those were the quantum error and the unjust enrichment, then Carter filed a 2619 motion to dismiss those counts. How do you get to decide contract cases on 2619? I believe the issue that went before the court was they said, look, if you look at how... I understood what happened was that Carter said to the trial court, if you look at the way Stark pled the counts, which is there was a reference to Stark is suing on a contract, so you can't get to the equitable relief. And secondly, the supposed scope of the relationship says because of that, you can't get equitable relief. So I think they came in really on a straight, more of a legal point, but I think they were pointing to some facts. And so I think what Carter was saying, I guess it could have been a 2615. We didn't file the motion. It wasn't there. But I think that's the approach, and I think that's how the trial court looked at it, because the trial court made two rulings. It said that Stark, you cannot have a quasi-contract, Counts 2 and 3, because you had an allegation of an express contract claim. And I think the court was wrong on that, because when you look at Counts 2 and 3, there was no express allegation. And as we cited case law, notwithstanding that, you can still bring it in the alternative without amending your pleading. And the second thing the trial court said was a party cannot recover under a quasi-contract if the specific contract governed the relationship. And again, as we noted, and it was argued to this court, that if it is an extra, which the trial court found unambiguously it was, that is, not within the contract, outside the scope of the contract, the court actually said, then how can one say that that governed the relationship? The relationship was do what was in the contract, not what was not in the contract. And as we noted, the case that – Well, it was an extra until you supplemented the original agreement with those two letters, which upped the bid, first time $2,000 and then second time $12,100, right? Well, not exactly, Your Honor. Let me – it was going to be my starting point to the court, which I was going to point out that there – and I'll address this there. I think there are six essential facts that frame the context for which this court, knowing its de novo review, would make its decision. But the first point is that winter protection, that winter heat, winter protection, was expressly excluded. That's what the trial court found also. Now let me address the letters. The original letter was a bid letter in July of 2005. And when you turn to the latter pages of it, you can see it expressly says it there, winter heat exclusions. It has a whole dot point list. It says winter heat excluded. It says winter protection excluded. There was a clarification letter sent – What's the difference between winter protection and winter heat? Okay, winter heat is a chemical admixture that the material supplier – so you go to the concrete plant and you pay for concrete, but you can also pay for the chemical. And they add it in to the concrete because it keeps – it's a matter of trying to eliminate the water out of the concrete. Because what happens with concrete is sand, gravel, water, it starts a chemical reaction called hydration. It starts forming crystals. It starts bonding. It gets harder. And anything that affects the water process, that's why it's temperature sensitive, particularly if you start pouring concrete, inside concrete, outside concrete. I'm not a construction expert, but I think we all have had driveways. I think we sort of have a sense of this. But winter protection is protecting the subgrade and the concrete itself. So you will put blankets on it. You will heat it as necessary. We're talking about an approximate 2-acre building pad. This is a warehouse addition. The depositions both agreed it was approximately a 2-acre pad, so we're not talking about a little back patio. Wait a minute. So the winter heat is the chemical that is added. Correct. But even when you add this chemical, you still need to protect the concrete by putting blankets or whatever over it? It depends on weather conditions, and that was a key issue here. So there is some kind of overlap between winter heat and winter protection. I don't think there's an overlap,  but winter heat, and I think the October, if I can just clarify it, in the August letter was sort of saying to Carter, look, I want to clarify certain issues here, and given if there's now going to be a mid-September start, that's what that letter said, then we're going to have about a two-grand increase for heat and protect. Now, that's what START said. They used both words. And I believe even in the deposition of Mr. Carter, he acknowledges that winter heat is on minimal cost. It's a chemical. He identified it and agreed it was calcium chloride. When you look at the October letter, I think this really puts it in context because then, if you recall, there was this October meeting, and the job is now getting delayed even further. It's getting pushed further in the year. There's this October meeting, and in the October meeting, Mr. Carter expresses, although there's a question of whether Mr. Stark was even present at the meeting, look, we're getting later in the year. If you're going to have some costs, you need to tell us so we can address that. And after the meeting, this October letter was written by Stark, and Stark says in that letter, among other things, it says, look, now that we're into an October-November period, the material supplier, he talks about the material supplier. I can pull a letter if need be, but I think I'm getting it right. The material supplier, the costs are now going to go up in terms of the heat that needs to be protected. What did the letter say about winter protection? It said nothing, Your Honor. Well, why not? Because I believe it was, it's, that, let me answer it. It's two parts to that answer. One, that letter said, basically, it referred back to its original July letter and said, as modified by this letter, this is the, this is, I can pull it out, this is the, so the October letter at the end says, the total package including the revisions found above, which I'll get to in a second, will be X dollars or an increase of Y dollars over our original July 25th proposal. So this letter was supplementing the July proposal. And in this letter it said, due to the two-month delay in beginning this project, this is first page of the letter, paragraph number two, all concrete utilized for the job will be subject to a winter heat charge by the material supplier. And if you go then, jump for a second, and you read the depositions that were taken below, Mr. Carter acknowledged, in response to questions, that he understood the difference between winter heat and winter protection. I believe that's a fair reading of the deposition. The upcharge associated with this charge will be 12,100. The 2,000 figure included in my letter dated August 18th was given based upon a mid-September start. And when you look at the August 18th letter, it's not, it's really saying, look, I'm going to clarify some things because it was responding, as evidenced from the beginning of the letter, to questions that I think were close. It's not unusual for a subcontractor and a contractor to try to say, okay, what about this, what about that? So what happens here is we have a contract, and Carter says in the deposition when he, when Carter, cut its deal with Menards and supposedly put in its contract all winter conditions, Carter says in there, I was relying on the August letter. Yet the subcontract that Carter enters into expressly states, with Stark, expressly states it's per the October quote. And the October quote wasn't a standalone quote. It was a supplementation to the July quote. And it didn't say anything about winter protection. It said winter heat. Admittedly confusing. Counsel, I'm having a hard time. I think your hurdle, at least in my mind, you might convince me otherwise, is that Carter comes to your client and says, we're starting way later than we thought. It's winter. It's going to be a winter pour now. So do what you need to do to your bid, if you still want to bid, so that we'll know what the ultimate cost is going to be. And yet the response apparently was $12,100, and you left out any reference whatsoever, I guess is your argument, to the winter protection. I think, Your Honor, the way the record showed below, I think it at least creates a materialistic effect. But in the depositions, as developing some of the evidence, in light of leading to the summary judgment motion, Stark says in there, hey, this turned out to be an unusually cold winter. There was frost on the ground. And I think what Stark was saying was, look, I can anticipate so much, but I can't anticipate everything. And, in fact, how hard would it have been in the October letter to make a contingency in case of cold weather or extraordinarily cold weather or our bid does not take into consideration additional winter protection, and that could be additional money zipped. I think the answer to that, hopefully, is self-evident. And I think the trial court found it self-evident. That October letter was not a standalone. It was a supplement to the July letter. In the July original bid, that was a revision to the original bid. It said it at the end, says at the back part, winter protection excluded. And I believe that's why the trial court looked at this and said that, I mean, if you look at the language the trial court said, it was not ambiguous as to the winter protection. The subcontractor excluded the winter protection. The word was outside the scope of the contract promises. You can't read the October letter as a standalone. And I believe, and Stark's not a lawyer, I don't believe he is, but I think what he was doing was saying, I quoted you. I put exclusions. We now have some change in circumstance. I'm telling you what is going to be revisions to my original bid. He said the only revision, winter heat was excluded. He now is coming in and saying, look, the material supplier is going to add some more stuff. And I was going to point out that in Carter's deposition, he even, he was saying he relied on August, he responded saying he agreed that neither of them could have known, back at least in August, and I think that's a fair inference, they couldn't have known in October, what the weather conditions actually could be. In other words, you could anticipate cold, but you might not have been able to reasonably anticipate what at least is expressed. And I will admit, honestly, it's not a greatly developed factual record, but at least it's supposed to be viewed in favor of Stark, and the average is taken from Stark. He's saying this turned out to be extraordinarily cold. There was frost on the ground. And he immediately goes to Carter and says, look, you know, I now need to do something more in view of this situation that we have, and if you will permit me, I'm going to jump and avoid my six points, but let me get to the threat issue, which I think becomes the other issue. So what happens here is, I think if you take the inferences in favor of Stark, how could Carter be telling, Carter may have been, Carter obviously either maybe knew or maybe didn't know, but the trial court believed it was unambiguous. I think it was unambiguous. I would like to think that Carter just missed it. But in any event, there would at least be a fact question, but what does Carter say to Stark? We have a project where there is delay. I mean, it's starting later. I think it's pretty self-evident or rational inference that if you're building a warehouse and you can't get the concrete pad down, you're going to have a problem getting the rest of the building in a normal sequence. It's already delayed. Obviously, the dollars are there. I think it's fair to see from the back and forth that, and I think Carter says it in his deposition, hey, if we don't get this done by February, then I don't want to be doing it. In other words, they're pushed. They've got to get this to a point. So what happens when Carter comes, or when Stark comes to Carter and says, look, I've got a different situation now than I didn't expect. I had excluded it. I mean, he's not saying this lawyerly-like, but he's saying it construction-like. I'm going to need this. And Carter is saying no. So what happens? Stark says, hey, I was threatened at this meeting on the job. Now, there's a question of fact of how you interpret it, and I believe if you read the trial court's, I think it's pages 18 to 20 on that transcript, I mean, clearly the trial court was saying they're weighing the evidence and making the decision which way to go, which I suggest cannot be done at the summary judgment stage. But what is Carter saying? Carter can't possibly have been saying to Stark, certainly if you view it, the inference there must, oh, perform your work, but don't perform it in a workmanlike manner. Carter said in his death, I relied on Stark. Stark knew better than I did as to what's needed. And Stark has said, hey, the weather changed. It got worse than we thought it was going to be. I think that's the fair inference. We now need something more that I had excluded in the beginning. And Stark also says, again, when I say Stark, I'm saying also I say in the brief, said, look, when Carter goes, you're going to kick me off the job, you're going to bring somebody else in, the weather doesn't change when you bring somebody else in, barring a little gap in the weather. When did Stark begin the project? Well, Stark had other work other than the pad. So I don't know that, Your Honor, but it was in approximately mid-November, I believe, when Stark actually started the concrete. I can't say for sure. There was some pavement work and other stuff, but at least by the first, I think either the first of January or the first week of January, the record said that the pad was done. So we were in a December, January moment at that point in time. But when you look at that thread, I mean, if you kick Stark off the job, and I think Stark reasonably believed this to be the case, look, you're going to pay for this anyway. The weather isn't going to change. I'm telling you, there's going to change. You need this. I excluded it. I mean, I'm filling in the spaces that weren't, you know, it wasn't a lawyer treatise, that's the way this evolved. We're going to need to do this. Carter can't possibly have been telling him, oh, sure, go ahead, do it, and do it, if you say it's excluded, just do your work. Do what your contract says. And then the pad fails, the delay goes further, extra costs, and I think Stark is put in a no-win situation. So we would suggest, Your Honors, that when you look at this, and let's just, if I can switch briefly, let's go over to the watts and lumber elements, I think, transition is here. We said, okay, there's five elements, watts and lumber, everybody who practices in construction law knows that's a Bible case. There are five elements. One, the work outside the scope of the contract. I think that's evident from the record. The trial court still found that. The work ordered by the owner and the owner agreeing to pay, the trial court said no, but we suggest when you look at the total circumstances, along with what is the threat and you take it, a favorable inference is Stark. You cannot give summary judgment and say you didn't satisfy those elements. Point four of watts and lumber is not voluntarily furnished. What has the trial court said? The trial court says in the February 24th transcript, pages 18 to 20, when it's going to be its ruling, it says, I know it's disputed. It says the word disputed. I added I know. But then it says, but nevertheless, I find it was voluntarily provided. I don't see how, honestly, and we argued it, if you apply the standards you're supposed to apply, that that court should have been able to reach that decision. And the fifth element of watts and is not rendered by the fault of the contractor. Extra work was not rendered by the fault of the contractor. What does the trial court say? It says it's not Stark's fault. So, as I said before, when you look at this, I think there clearly were questions of fact as to, I think Stark was denied a right to go to trial on the issue and tried this issue of what did this really mean in terms of the circumstances of how it evolved, the threat or non-threat. But when Stark went to Carter and asked about the additional cost and Carter said no, why didn't Stark walk off the job? I believe the answer would be this, and I can't say that I ever talked to Stark, and I don't know if there's a record, but in a subcontractor who is clearly on the critical path, his work isn't done, the next step in the work isn't done, knows the project's behind, walks off a job, if that subcontractor is wrong, even if you think you're right or you're wrong, you're going to have a problem because they're going to come back at you and I think Stark really thought this process out. That's why I think in Stark's December letter it said, look, I'm going to try to make you the schedule. As I pointed in the brief, unsophisticated, but Stark was like, look, I understand I'm going to mitigate the harm to the project because I don't want you to be suing me for delays, suing me for extra costs. That's why I think the trial court, in its own decision, of what should have been done, but that's a question of fact for trial. Let me ask you one other thing. We're talking about 2619. On 2619, it's really a summary judgment plus. The court is entitled to resolve issues of fact on a 2619 motion. That's correct. 2619 was not on Count 1, the winter protection. It was on Counts 2 and 3. The court applies only law on that one, I would suggest. If I could turn to that argument while my light's on. You'll have rebuttal. Okay. All right. Here's what the trial court says. No, counsel, you'll have rebuttal. Oh, I'm sorry. Okay. I apologize. May it please the court, counsel. Of course, my name is Kevin Colombo, and I represent Carter Construction Services, Inc. of Champaign on this case. I have really no dispute with the facts as recited by the attorney for Stark. The one thing I think the court did focus on or ask about was the delay of the start of the project, which I think is kind of critical in this case in a way,  where they originally started the bidding process on this. It was delayed for no fault of either of the parties. In this case, it had to do with the city of Champaign. So what happened was it turned out that the project was not going to start until October, November. And so Menards, as the owner on the project, said the same thing to Carter and in turn Carter to Stark and all the other subcontractors. We are going to be doing this project in the winter months. And, of course, everybody in that business knows when you do a project in the winter months, that's going to have some impact financially on the project. But you don't know how much. Right. A bad winter will be worse maybe than an easy winter. That's exactly right. And so you could have built contingencies in. And that's exactly right. Everybody is going to have to do their best to estimate it or build contingencies in. Everybody in this project, Stark, Carter, the other subcontractors with the exception of the electrical contractor, all of them changed their bids and increased their bids at that point in time. Stark stood by its original bid on winter protection. Well, actually, winter protection, I mean, it added $12,100 and it simply that was the winter heat. I've got the term wrong, winter heat. No, it actually increased it by $12,100 in the October bid. It did increase it. Increased what? I'm sorry? Increased winter heat or winter protection? Well, that's the thing. You know, when you looked at the original July bid, it talked about winter heat and winter protection and added $2,000 for that. When it actually submitted the letter in the increase in the October one, it only referenced winter heat. And I agree that that's all it said. And it said $12,100 for that extra winter heat. The July bid specifically excluded winter protection and winter heat. And then the October letter only talked about winter heat. Actually, I may be confusing because I think in September there was kind of an interim one where they added $2,000 in September. That was the August letter. Maybe it was August, yeah. And again, there was a July, then there was an August. And so it kind of crept up. When it got to October, it was $12,100. And I would have to agree it didn't say anything specifically about winter protection. But I remember from Carter's, you know, when you look at this whole situation, it's Stark who is the concrete expert. They were actually going to work on four phases of this project. Concrete was just one of the phases. They were going to do all of the concrete. And, of course, we're really only concerned about the concrete phase. But they were given an opportunity to back it out or to change their bid to include winter protection, more money for winter heat. They did for winter heat. They did not include anything for winter protection. And in my brief, I posited the only five I could think of. I'm sure there's other reasons, but the only five reasons I could think of why they did not include that. They knew, since they were not going to be starting until November, they knew the floor was going to be sometime between December and be done by January 1st. So they certainly knew, knew that this was going to be done during the winter. And it was up to them. Do you agree it was an unusually cold winter? No. I have no facts. There's no facts at all. There's one statement in one, in Mr. Stark's brief. He said it was unusually cold. That's the only evidence we have. I have no independent knowledge of that. There was no other evidence submitted to the court. So they could have put a contingency in, though. And I think that's what the court was kind of alluding to with Stark's attorney, is they could have done something, because they did that on other phases. They put contingencies in. Well, for example, I think they did on the soil stabilization, that if we run into these circumstances, our bid will go up to as much as I think the number was $179,000. They had that contingency if it turned out the soil had problems and they had to do with what's called lime stabilization. But they didn't do it with regard to winter protection. Why doesn't the agreement that winter protection is excluded, why doesn't that still stand? Well, that's the whole point. When this all came up in December, this problem came up, they came and asked for authorization. Carter told them no. Menards told them no. In effect, they're telling them, don't do it. They're not required to do it. They're not required to do it. We want you to. As counsel says, Stark's choice was either to go ahead and do it and not get Well, I'm not sure I agree with that, Your Honor, simply because their option was to perform pursuant to the contract, and that's all they were required to do. When you had the exchange of letters, they said, we'll go ahead and finish the job, but we are going to rely on the original contract, the original subcontract. That's absolutely correct. We're going to finish the job. In accordance with the terms of the subcontract. And if they had done it in accordance with the terms of the subcontract, they would not have winter protection. The question is, what are the terms of the subcontract? To do the job in a workmanlike manner. And that's it. That's all they were required to do. They were required to do the pour, to put in the pad, in a workmanlike manner. But what is the, you aren't saying they should have just gone ahead and done the job without the winter protection? They absolutely could have, yes. They were not required to do winter protection. No one asked them to do it. If the concrete becomes defective because they didn't protect it, you're saying that they wouldn't have been asked to correct it or perhaps be sued because the whole project, as counsel indicated, fails if you don't get the slab down to put up the building. Well, of course, that's a possibility. Simply though, the contract did not require them to do winter protection. They came to Carter and they started talking about winter protection and Carter told them, simply do it pursuant to the contract. That's all we're asking you to do. We're not asking you to do winter protection. They're the ones who brought it up. And so my point is, yeah, I mean, this is total speculation. How much money is involved here? They're requesting like $300,000? $180,000. I thought it was $300,000. Well, that was total. I think that was total on all their – their total contract was over $1 million. Right. But I think that involves some retainage and involves some other things that we took care of. Are you saying the winter protection was an additional $180,000? An additional $180,000 just on the concrete phase. Right. Just on the concrete phase. In fact, I don't know how it exactly broke down, but I think the winter protection was more than the whole concrete bill. So they spend an additional $180,000 to make sure that the concrete that they pour doesn't become defective, and the reason they have to do the winter protection is because the project is delayed, no fault of theirs whatsoever, and now they're responsible just for making their product perform the way it was supposed to? All right. Again, I think you have to go back to October when they're told to re-bid their contract and presume it's going to be done during the winter. They could have increased their price to ask for winter protection. They could have done that. They chose not to. They literally chose not to. They chose to stick by their original contract in which they would do no winter protection. So you don't think there's any factual question on whether they chose not to pursuant to that October letter when you combine that with the August letter and the original contract? I think there is none. They were not required to do winter protection. They didn't get a hearing on that? No, because it seems to me they had a contract. Carter's entitled to rely on the contract. They're entitled to rely on the contract, and the contract did not require them to do winter protection. They came and asked. They asked both Carter, and as they say in their brief, they asked the owner, they asked Carter, and both of them told them, we are not authorizing it, you're not going to get paid to do it, and in the face of that, they went and did it anyway. Wouldn't it be a defense for them if down the road there was a problem with the concrete pad? They would say, well, I went to the contractor, I went to the owner, I told them we needed to do it, they didn't authorize it, they wouldn't authorize it, so therefore it starts not liable. I suppose that could be if that ever happened, but I guess we're just speculating at this point in time as to what might have happened. Again, this is where we get into the point of speculation. All we were required to do was to honor their contract. All I'm saying is, if the owner tells you, I don't want that in there, and you go ahead and do it, it seems to me you're doing it at your own risk. Correct. And if by not throwing it in, the pad wouldn't be right, the owner's assuming that risk. Right, exactly. And as I say, that's what Judge Ford found. I said, you know, when you come there and you ask them, they were asking for authorization, it wasn't like the carter asked them to do it or the owner asked them to do it. They came on their own, they asked for authorization, they were told, no, perform according to the contract. That's all we're asking that you do. Do you agree the contract did not require Stark to do winter protection for nothing? I agree that it didn't require them to do it at all. At all. That's what I agree, that it did not require them to do winter protection at all. They did it on their own. Not only did they do it on their own, they basically came and asked about doing it and they were told, no. And it went even further because at that point in time, they asked Carter and Carter told them, we're not going to pay for it. They specifically were told, we are not going to authorize that as extra work. We want you to perform pursuant to your contract and nothing more. Well, if it's outside of the written contract, why can't they proceed under quantum merit theory? Well, there are, well, let me get to that. To proceed on quantum merit, there are clearly, and there's case after case, I cited the Inspalco case and even counsel for Stark cited the Miller case, the construction case. All of them show that for quantum merit, you have to show, you have to plead and prove, four elements that have performed a service to benefit the defendant. Well, again, we're only talking about the winter protection here. My point before this court is, there is no benefit to Carter. Absolutely no benefit. They don't point to any benefit and I've racked my brain trying to think of a benefit to Carter by them doing this winter protection and I cannot think of a benefit. How about it kept the concrete from becoming defective or worthless? My point is, they didn't receive a benefit that they were not entitled to under their contract. When I think of a benefit, I think of something above and beyond what they were contractually already entitled to. They were entitled to have the work done in a workmanlike manner. That's what they were entitled to. What benefit did Carter get that they weren't contractually entitled to? They were contractually entitled to have all the work done in a workmanlike manner. They were entitled contractually to have the work done in a timely manner. Workmanlike manner except winter protection is specifically excluded. That's correct. That is correct. So that's workmanlike manner minus. It is not strictly a workmanlike manner. I would think it is workmanlike manner. They're claiming it's not a workmanlike manner but we certainly didn't claim it. They're now making that claim trying to create a factual dispute because we didn't require them to do that. They did it voluntarily. It seems so obvious to me. Even a layman knows that concrete work in winter is tricky stuff and you have to take special precautions and you're saying no, that's not true. No, I'm not saying it. I'm saying they have to get a benefit that's unjust for them to retain. They were contractually entitled to this. They held the control of how they were going to bid their contract. They could have bid their contract to say, okay, listen, if we run into unusually cold weather, we run into these problems, then we may need to charge you more for this. But they elected not to do that. They said we're just going to exclude it entirely. We accepted it on that basis that it was going to be excluded entirely. They didn't say it was excluded from the job. They said it was excluded from the price. The price does not include winter protection. I have a hard time distinguishing between the two because it seems to me we're excluding it entirely. Isn't it common in contractor cases to bill for extras? It happens all the time. You can't anticipate with a big project exactly what's going to happen. That's absolutely correct, and this contract provided for that. You could have extras as long as it was approved. You could have extras that were approved, and it had a whole procedure for how you could obtain extras. You'd make an application for extra work order, and it had to be approved by Carter. In this particular case, they did do that. They applied for it and were denied. They were denied by both Carter, and they were denied by the owner on the job. So they're essentially being told, we don't want it, we simply want you to perform pursuant to your contract. But you want them to do it in a workmanlike manner. Well, I think they're obligated under the contract. Well, on the one hand, you say they don't have to do the winter protection. On the other hand, you say they do have to do the winter protection. Well, I really don't think I'm saying this. I'm not trying to say that, Your Honor. I'm trying to say that the contract required them to do it in a specific fashion, and they controlled their own contract. They controlled their bid, and they submitted the bid, and we accepted on the basis that they submitted their bid to us. So we're simply asking them to look at their contract. Otherwise, you'd have a situation where they would be controlling, you'd have to pay them. They'd just simply say, we have to do it, you have to pay us. And that's the situation you'd really have. Every subcontractor could say, we decide, you need it, you now have to pay for it. And I don't think that that would be a just result. Is there a question of fact here, whether the winter protection was needed? I don't see that because I say simply, the contract didn't require them to do it, we didn't require them to do it. They did it on their own, even after they were told to. The contract requires them to do it in a workmanlike manner. If a workmanlike manner includes the winter protection, the contract requires them to do it. How can you say, oh, just forget about that? Well, Judge, again, I don't think that the contract, you know, the contract does have implicitly saying you must do it in a workmanlike manner. They could have just simply, and as Judge Ford found, they could have simply done it exactly the way the contract called for, they would have gotten paid, and that would have been the end of it. Now, you're saying, well, you're speculating that, well, gee, what happened if the concrete later failed? But that's just simply speculation. I mean, that's not a fact. That's just simply speculating. It is not a fact that cold weather affects the laying of concrete? It possibly could have depended on how cold it was. I mean, there was no testimony on it at all. There was no testimony by either side on this at all. There was no evidence submitted to the court. This came on summary judgment. They had no testimony whatsoever how cold would have affected this. There was no evidence before the court on that issue, nothing. There was absolutely zero evidence before the court that cold would have affected this concrete or it would have failed. They presented no evidence. It was completely devoid of evidence on that particular issue. Counsel, I'd like to get back to those four parts of Quagmire. You talked about the first one, perform service to benefit the defendant. The service was not performed gratuitously. Are you saying this was gratuitous, this $180,000? Yes, because under the circumstances of this case, Judge, when Stark came to Carter, they had an office meeting, and then they had an exchange of letters. Okay, more importantly and more specifically, there was no factual question about that? No, because they were simply told they weren't going to be paid. I mean, it was absolutely clear. They admitted. They came to them. They asked for authorization. They were denied. And then on top of that, they were sent a letter saying, we will not approve a change order to pay you for that. So when you're told you are not going to be paid for it, and in the face of that, you go ahead and do it, I'm saying you're doing it gratuitously because you're told by the owner you're not going to be paid. So that, to me, answers that clearly. They were told, we are not going to pay you for that work. And the third one is the defendant accepted the service. I don't see what Carter did to accept the service. What could they have done? They did the work. At least they alleged they did the work, and who accepted at this point that they did the work? But what did Carter do to accept the service? It was basically forced on them. And then, of course, one of the most important, if not the most important, is no contract had existed for those services. Well, they're looking at the winter protection work and saying no contract existed for that, but there actually is a contract, and it says it was excluded, and the concrete work was certainly in there. So my point is I think a contract did exist, but it specifically excluded it. And as I say, in the face of all that, they went ahead and did it. So, you know, as I say, under the facts and circumstances of this case, when you're told we're not asking you to do it, you're not required to do it under the contract, and in the face of all that, you do it, I think you've done it gratuitously. And again, when you talk about unjust enrichment and the quantum merit, the keystone to all that, has the defendant received a benefit unjustly? And I do not see, again, I understand the court's question, but I do not see that Carter, benefit of all, they received no benefit that they weren't entitled to under the contract. They didn't receive one more penny, they didn't pay them one less penny, they didn't receive one more penny from Menards, and of course the building's not even theirs anyway, they're not the owner on the project. Okay, counsel, you are out of time. Thank you. We'll have rebuttal now. I'd like to address three primary points, just a couple more. You were told there was no evidence in the record about cold weather. Let me quote you from page 32 of David Stark's deposition attached to the underlying summary judgment papers. It is the only evidence in the record. We briefed it and said it was admissible evidence of lay opinion. Well, on the project it was, I say, an unusually cold December. There was a lot of frost in the ground. I'm going to skip the irrelevant part. And we would heat the ground to get the frost out of the ground. After we would pour the slab, we would have to protect the concrete by heating it and covering it during its curing process, so that it could, so that the cold weather wouldn't damage the slab after reporting. There was evidence in the record. It was the only evidence in the record. It at least raises the question of fact. Two, was there a benefit? Certainly there was a benefit. Carter was not entitled to receive this extra work. And I think your honors have recognized that. And they ended up getting, I know the dollar issue of 180,000, but it's two acres. And you could have the cover frozen. Well, that seems to me to come right back to where, I think you and I discussed this 40 minutes ago, is why not in that October letter, didn't you protect yourself? Why didn't your client say, we can't guarantee the quality of the concrete unless we provide winter protection, which will cost more money? I guess I would answer it this way. I know that I'm reaching a little bit. I can't point to something in the record. I wasn't there while it was happening. But it is not unusual when you see bids. Bids say, this is what I'm bidding for at this price. This is what I'm excluding. And in construction, I think it was sort of hinted to by Justice Cook and yourself, Justice Turner, that you can't necessarily anticipate every possible thing that could happen. I know there was this reference to this line stabilization, which was the R&R case that was argued below, never relied on by the trial court. But in that case, the appellate court found that it was a performance standard. It said soil to a certain density. It didn't matter how you got to that density. You had to give a soil compacted to a different density. So that had nothing to do with it, Your Honor, Justice Pope. Stark was faced with a situation in the middle. It had a duty to mitigate damages in the situation also and mitigate its own damages. And I think it really needed to go mitigate for the project. I know it's difficult to understand. Construction is a little unusual in the sense of what happens here. But Stark, I think, at a minimum, there's a question of fairness, which was important. And as to what this threat, what it really meant, what they were asking for. And he was entitled to, Carter was entitled to the work contracted for, not anything else. And it was expressed in there, maybe not the way we would do it in hindsight, and say it should have been clearer. But he said, these are revisions to my July proposal. So you look at the revisions. The revision was, okay, you're going to now have a material supplier that's going to have to put in extra heat. Otherwise, he's saying I'm standing by my proposal. But clearly, at a minimum, if he doesn't get, if the summary judgment, like I said, there's no question of fact, I certainly think, and I'll stand on my arguments in the brief, which I think will elaborate on it, that he's entitled as an alternative remedy. And if he fails at Stark, fails at Trout, to prove an implied in fact contract, then he has an opportunity, as even counsel said, to plead and prove that he's entitled to get recovery under quantum error. How could anybody get next to this? When it's undisputed, the general contractor said, absolutely not, do not do it, we're not paying you for it. Your Honor, I would suggest that that's not in the record. I don't think anybody clearly said, don't do it. In fact, we say, basically said, if you don't get this work done, I'm bringing somebody else in to do it. Which I argued, and I'm arguing to the court, is an indication, you have to take it into broader context. He made this contract with delay. I would suggest he was bullying Stark into getting this done, knowing that if he didn't get it done, he could have failure at the concrete, he'd get a delay, he'd have to hunt around and hire another contractor. Well, our partner said in his December 6th letter, that it would only sign work orders pre-approved by Menard's project manager. So that was saying, wasn't that saying, don't do it? I don't think it was expressly saying it, but I do agree that that would be the consequence of that. So was that before the winter protection was undertaken? Well, I think it's not a clear record, but there is an indication, I think, from the depositions, where Mr. Stark acknowledged that he had started the winter protection like December, before he wrote the December 6th or 7th letter, but the job didn't really start until mid, because I think he was thawing the ground. But he did do it after he brought it to the attention of Carter and said, look, I have a change in circumstances in the field. I'm not doing this gratuitously on my own, and just throwing this in because I want to do it. I don't have a choice to do it. Thank you. Thanks to both of you. The case is submitted. The court stands in recess.